*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0358p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

TOM DEFOE, a minor by and through his
parent and guardian Phil Defoe; PHIL DEFOE,
                            *Plaintiffs-Appellants,*

                    *v.*

SID SPIVA, in his individual and official
capacity as Principal of Anderson County
Career and Technical School; MERL KRULL,
in his individual and official capacity as
Assistant Principal of Anderson County
Vocational and Technical School; GREG
DEAL, in his individual and official capacity
as Principal of Anderson County High
School; V. L. STONECIPHER, in his official
capacity as Director of Schools for Anderson
County; JOHN BURRELL, in his official
capacity as Chairman of the Anderson County
School Board; ANDERSON COUNTY SCHOOL
BOARD,

                            *Defendants-Appellees.*

No. 09-6080

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 06-00450—Thomas A. Varlan, District Judge.

Argued: June 16, 2010

Decided and Filed: November 18, 2010

Before: CLAY, ROGERS, and COOK, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Van R. Irion, LAW OFFICES OF VAN R. IRION, Knoxville, Tennessee,
for Appellants. Jonathan Swann Taylor, TAYLOR, FLEISHMAN & KNIGHT, P.C.,
Knoxville, Tennessee, for Appellees. **ON BRIEF:** Van R. Irion, LAW OFFICES OF
VAN R. IRION, Knoxville, Tennessee, for Appellants. Arthur F. Knight, III, TAYLOR,
FLEISHMAN & KNIGHT, P.C., Knoxville, Tennessee, for Appellees.

CLAY, J., delivered the judgment of the court and an opinion. ROGERS, J. (pp. 22–28), delivered a separate concurring opinion, in which COOK, J., joined.

————————————

**OPINION**

————————————

CLAY, Circuit Judge. Plaintiff Tom Defoe, a minor by and through his parent and guardian, Plaintiff Phil Defoe, and Plaintiff Phil Defoe, individually, appeal an order entered by the district court granting summary judgment for Defendants Sid Spiva, Merl Krull, Greg Deal, V.L. Stonecipher, John Burrell, and the Anderson County, Tennessee School Board based upon this Court's decision in *Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008). On appeal, Plaintiffs argue that the district court erroneously granted summary judgment in favor of Defendants based on the court's conclusions that the evidence demonstrated that school officials banned displays of the Confederate flag based on a reasonable forecast that those displays would substantially disrupt or materially interfere with the school environment. For the reasons set forth below, we **AFFIRM** the district court's decision.

To the extent that there are any differences between this opinion and the concurring opinion, the concurring opinion shall govern as stating the panel's majority position.

## I. BACKGROUND

### A.     Factual Background

The Anderson County school district encompasses seventeen schools, including two high schools, Anderson County High School ("ACHS") and Clinton High School ("Clinton"), and one vocational school, Anderson County Career and Technical Center ("ACCTC"). ACCTC, which is located on the ACHS campus, draws students from both high schools. Plaintiff Tom Defoe attended both ACHS and ACCTC through at least December 2007. Plaintiff Phil Defoe is Tom Defoe's father.

All Anderson County schools have a code of student conduct in effect that states "[a]pparel or appearance, which tends to draw attention to an individual rather than to a learning situation, must be avoided." (Appellees' Br. 11.) The policy further states that "[c]lothing and accessories such as backpacks, patches, jewelry, and notebooks must not display (1) racial or ethnic slurs/symbols, (2) gang affiliations, (3) vulgar, subversive, or sexually suggestive language or images; nor, should they promote products which students may not legally buy; such as alcohol, tobacco, and illegal drugs." (*Id.*)

According to V.L. Stonecipher, Director of Anderson County schools, a racially tense environment has existed at Clinton High School since 1956 when the school was integrated.[1] (Trial Tr. Vol. I 96-99.) Stonecipher has been employed by Anderson County schools since 1965 as a teacher, principal, and administrator. He testified in the court below that during his tenure with the Anderson County school system, he has dealt with several instances of racial hatred such as the name-calling experienced by black students. Stonecipher stated that displays of the Confederate flag would be a distraction to any student offended by it and could result in some sort of dangerous disagreement resulting in conflict or violence.

John Burrell, Chairman of the Anderson County School Board, stated that the Board decided to ban anything it felt would be disruptive to students, and the Confederate flag fell into that category. Burrell stated that he would not consider lifting the ban as long as the flag was disruptive to any students in the school system. Specifically, Burrell said he "would be against removing the ban as long as we have a racially mixed group with some of those students who I think [the flag] would be offensive to." (Trial Tr. Vol. I 49.) Burrell stated that after a student becomes offended, "the next step is a fight, a riot, that type of situation." (Trial Tr. Vol. I 63.) Burrell also

---

[1]On August 27, 1956 twelve black students, known as the Clinton 12, integrated Clinton High School. Because of the backlash that subsequently ensued, the National Guard was brought in to restore and maintain order. On October 5, 1958, Clinton High School was bombed. The school was rebuilt and reopened in 1960. The campus of what once was Clinton High School is now the campus of Clinton Middle School.

testified that if a child was sitting in class and something is offensive to him or her, that could affect the child's learning.

Several racial incidents have occurred at both ACHS and ACCTC. Examples of such happenings are detailed below.

### 1.        Anderson County High School

Greg Deal, the ACHS principal, testified that racial tension has existed in the community for years. (Trial Tr. Vol. II 117-19.) Deal recalled an incident that occurred in 2003 where a Hispanic male student had a verbal confrontation with a white female student in class about a paper on her desk and a white male student told the Hispanic student to shut up. After class and on the way to lunch, the same white male student called the Hispanic student a "sand nigger, dirty mexican." (*Id.* at 122-23.) The Hispanic student went to his older brother and told him what happened. The student's big brother subsequently got into a physical confrontation with the white male student. Also in 2003, two Hispanic students approached Deal complaining that they were being called "dirty niggers, sand niggers and dirty mexicans" and told that they need to leave ACHS when they walked down the "redneck hallway."[2] (*Id.* at 126.) Deal noted that when he went to talk to the self-proclaimed "rednecks," some of them were wearing the Confederate flag.

In January 2005, there was a basketball game between ACHS and Clinton High School. Clinton had a biracial basketball player. Prior to the commencement of the game, ACHS students threw Oreo cookies onto the basketball court as the biracial player was completing warm-up drills. (*Id.* at 123.) Deal's investigation into this incident

---

[2]Deal testified that various groups of students hang out in different areas of the campus. The "redneck hallway" referred to by the Hispanic students was where "the John Deere gang or the rednecks, the young men who liked to wear [Carhartts]" hung out with each other. (Trial Tr. Vol. II 125.) Urbandictionary.com defines the term "redneck" as a "[m]ildly offensive term for a lower class white person from the southeastern states of the [United States]."

revealed that the students threw the Oreo cookies at the player because one of his parents is black and one is white.[3]   (*Id.* at 123.)

In August 2005, two black male students, one of whom had been displaced by Hurricane Katrina, enrolled at ACHS.  Deal testified that, according to his recollection, a black student had not attended ACHS since 1990 or 1991.  Two days after the two black male students enrolled, a large Confederate flag was draped in a school hallway.  Deal testified that he had never seen a Confederate flag hanging in the hallway before, yet, two days after two black male students enrolled at the school, there was a Confederate flag hanging in the hallway.  When Deal went over to remove the flag from the wall, he observed the "rednecks" or John Deere gang "laughing and snickering" as he took the flag down.  (*Id.* at 109.)  Deal considered the flag to be a message to the administration "that, hey, we don't want these black young men enrolled in our school." (*Id.*)

There was also an incident where a black student from Clinton High School attending a leadership class at ACHS was called a "nigger" by a group of white students. (*Id.* at 131.)  In 2008, racially-charged graffiti was discovered in the school auditorium and in two areas of the high school football stadium.  In the auditorium, a Swastika was found along with the terms "niggers" and "white power."  (*Id.* at 133.)  On the football bleachers, graffiti included comments like "White 4 Life" and "I Hate Niggas, J/K AVM."[4]  (*Id.* at 140.)  In 2008, graffiti discovered on the track pole vault pit was determined to be the names of a black male student and a white female student along with "something about nigger-lover, white girl, black boy, in my school" and a picture of a hangman's noose (*Id.* at 142-43.)  The two students whose names were written were dating at the time.  Deal stated that he believed lifting the Confederate flag ban would disrupt the learning environment.

---

[3]Although often used to describe persons deemed "[b]lack on the outside, [w]hite on the inside," Urbandictionary.com, the term "oreo" is sometimes used to refer to a person of black and white heritage.

[4]Deal testified that he understood "J/K" to mean "joking" and AVM to stand for "Andersonville Mafia," which is a group of students Deal characterized as a "[g]ang[] or gang 'wannabes'" who think they are "gangsters."  (Trial Tr. Vol. II 140-41.)

## 2.        Anderson County Career and Technical Center

Until he retired, Sidney Spiva was the principal at ACCTC. Spiva recalled an incident at ACCTC when he confiscated a student's shirt. Spiva testified that the student's shirt bore an image of a skeleton in the same kind of robe worn by members of the Ku Klux Klan ("KKK") and included an image of the Confederate flag. He stated that the student's mother came down to the school and was upset that Spiva even commented to the student about his shirt.

Spiva testified that he believes the presence of the Confederate flag, even in a virtually all-white school, would likely disrupt the learning environment. Spiva also noted that recruiting minorities to ACCTC had been a struggle and that out of 400 or so students enrolled while he was the principal, only two or three were minorities. Spiva said that during interviews with potential minority recruits at Clinton, the students stated they did not want to attend ACCTC for reasons such as they "don't want to go up there with those rednecks." (Trial Tr. Vol. I 139.)

Tim Parrott, the current principal of ACCTC, also testified about several racial incidents that had occurred at ACCTC. The first incident was a parent complaint about a black male student being called a "nigger" on the school bus. (Parrott Dep. 67.) The second incident involved a black student who requested to change classes and return to Clinton High School because he was afraid of a white student at ACHS. (*Id.* at 68.) The third incident involved three white male students who were singing a racial song about a black student on the school bus, one of whom had an image of the Confederate flag on his belt buckle. (*Id.* at 69.) There was also a fight on the bus arising from one student, in a text message, making a racial joke about a particular female student.

Merl Krull, the Assistant Principal at ACCTC, testified regarding a racial incident where a biracial female student was subjected to racist name-calling. Krull noted that the student "was very upset about what had happened in the classroom and wanted to call home." (Trial Tr. Vol. II 12.) Krull testified that he believed lifting the Confederate flag ban might result in more incidents of students arguing about the display

of the flag. David Landrum, a welding instructor at ACCTC, also stated that lifting the Confederate flag ban would probably result in disruption to the learning environment.

Prior to becoming principal of ACCTC, Parrott was assistant vice principal at Clinton High School. Parrott recalled several episodes occurring during his tenure as vice president at Clinton High School, including multiple incidents of racially-charged graffiti that had to be painted over. Examples of such graffiti included KKK references, "I hate niggers," and "Kill all the niggers." (Trial Tr. Vol. III 15.) Parrott stated that he kept a can of spray paint in his office because if such graffiti was not removed from the walls immediately, there could have been a fight. Clinton High School administration once discovered graffiti in the girls' restroom that said "I hate this nigger-hating school. I'm going to blow it up." (*Id.*) There had even been a noose discovered in a student's locker along with stickers displaying terms like "White Power" and "KKK." (*Id.* at 17.)

On October 30, 2006, Tom Defoe wore a t-shirt to school bearing an image of the Confederate flag. School officials told Defoe he was in violation of the code of conduct and he was asked to either turn the shirt inside out or remove it. Defoe refused to comply so he was sent home. On November 6, 2006, Defoe wore a belt buckle to school that displayed an image of the Confederate flag. A school official informed Defoe he was in violation of the code of conduct and when Defoe refused to comply with the dress code, he was suspended. Prior to these two incidents, Defoe wore clothing depicting the Confederate battle flag on several occasions but complied when school officials requested he remove or cover the clothing.

### B.       Procedural History

On November 20, 2006, Plaintiffs commenced this action, alleging violation of the First and Fourteenth Amendments. Plaintiffs filed a motion for a preliminary injunction and a temporary restraining order the same day. On May 16, 2007, the district court denied Plaintiffs' motion. Plaintiffs also filed a motion to amend their complaint, which was denied.

On September 21, 2007, Plaintiffs filed a motion for summary judgment, which was denied. Although the record does not make clear exactly when, at some point, Defendants also moved for summary judgment. Defendants' motion was denied. Plaintiffs moved for reconsideration of their summary judgment motion. Plaintiffs subsequently requested the recusal of the district court judge and moved once again to amend their complaint in order to add two additional parties.

Defendants filed a response to Plaintiffs' motion to reconsider in which they argued that summary judgment should be granted in favor of the individual Defendants based on qualified immunity. The district court denied both Plaintiffs' and Defendants' motions for reconsideration of their respective summary judgment motions. On January 7, 2008, the court granted Plaintiffs' motion to amend. On January 9, 2008, Defendants filed an interlocutory appeal regarding the district court's denial of their summary judgment motion asserting qualified immunity.

Defendants dismissed their appeal on March 26, 2008 and filed a motion for partial summary judgment on April 28, 2008, arguing that the individual defendants were entitled to qualified immunity. The court granted Defendants' motion for partial summary judgment in part and denied it in part, concluding that Stonecipher and Burrell, who were added after Defendant's initial summary judgment motion, were entitled to qualified immunity in their individual capacities and, as it had previously concluded, the other Defendants were not entitled to qualified immunity.

From August 11, 2008 through August 15, 2008, a jury trial was held that ended in a mistrial because the jury was unable to reach an unanimous verdict. The district court subsequently requested that the parties file post-trial briefs in light of this Court's decision in *Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008). On August 11, 2009, the district court granted summary judgment in favor of Defendants and dismissed the action. Plaintiffs now appeal.

## II. DISCUSSION

### A.     Standard of Review

The Court reviews *de novo* a motion for summary judgment. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Where the record, viewed as a whole, "could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In considering a summary judgment motion, all inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. *Id.* A judge's role is not to weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986).

Once a summary judgment motion is properly made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *accord Matsushita*, 475 U.S. at 587. If the opposing party fails to respond in this manner, summary judgment should be entered against that party if appropriate. Fed. R. Civ. P. 56(e)(2). The opposing party must present more than a "mere scintilla" of evidence; the evidence must be such that a reasonable jury could find for the non-movant. *Anderson*, 477 U.S. at 252.

### B.     Analysis

#### 1.     Relevant Precedent

In *Tinker v. Des Moines Independent Community School District*, the Supreme Court made clear that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students." 393 U.S. 503, 506 (1969). Indeed, it is well-established that students do not "shed their

constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* Nonetheless, school officials retain some "authority . . . consistent with fundamental constitutional safeguards to prescribe and control conduct in the schools." *Id.* at 507. "[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," and the Constitution does not compel "school officials to surrender control of the American public school system to public school students. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 686 (1986). Students' First Amendment rights must be "applied in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506.

In *Tinker*, the Court considered whether schools violated students' First Amendment rights when they suspended students who wore black armbands to school as an expression of their opposition to the Vietnam War. The Court determined that "the wearing of armbands in the circumstances of this case was entirely divorced from actually or potentially disruptive conduct by those participating in it" and more "akin to 'pure speech,'" which was entitled to comprehensive protection under the First Amendment. *Id.* at 505-06.

The Court noted the absence of any evidence that the suspended students' protest interfered with the schools' work or collided with the rights of other students to be secure and let alone. *Id.* at 508. Specifically, the Court noted that the wearing of the armbands did not "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id.* at 509 (internal quotation marks omitted). Instead, concluded the Court, the schools' actions appeared to have been motivated by "an urgent wish to avoid controversy which might result from the expression . . . of opposition to this Nation's part in the conflagration in Vietnam." *Id.* at 510. Because there was no evidence that "school authorities had reason to anticipate that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students," the Court reversed the appellate court's affirmance of dismissal. *Id.* at 509.

In two subsequent cases, the Court clarified that schools did not always need to justify the regulation of student speech using the *Tinker* framework.  In *Bethel School District No. 403 v. Fraser*, a male student, while delivering a speech nominating another student for an elected student office, referred to the candidate using a graphic, sexually explicit metaphor.  The Court considered whether the student's public high school violated his First Amendment rights when it suspended him for violating the school's rule prohibiting "the use of obscene, profane language or gestures."  478 U.S. at 678.

The Court concluded that the First Amendment did not preclude the school from punishing the student, noting that it is "a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse."  *Id.* at 683.  The Court referenced the "marked distinction between the political 'message' of the armbands in *Tinker* and the sexual content of [the student's] speech" and the "obvious concern . . . to protect children–especially in a captive audience–from exposure to sexually explicit, indecent, or lewd speech."  *Id.* at 684.  Consequently, stated the Court, "[s]chools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct" such as that of the student.  *Id.* at 683.

In *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), the Supreme Court addressed whether a public high school violated students' First Amendment rights by exercising editorial control over the style and content of student speech in a school-sponsored activity.  Staff members of a high school newspaper brought suit against the school district, alleging that the principal violated their First Amendment rights when he deleted two pages of the newspaper that contained students' experiences regarding pregnancy and the effect of divorce on students.  The Court noted that the question confronted in *Tinker* differed from the question currently before it, *id.* at 270-71, and concluded that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns."  *Id.* at 273.

As this Court noted in *Barr v. Lafon*:

> The above trilogy of cases yields three principles: (1) under *Fraser*, a school may categorically prohibit vulgar, lewd, indecent, or plainly offensive student speech, *Fraser*, 478 U.S. at 683-85, 106 S.Ct. 3159; *Hazelwood*, 484 U.S. at 272 n. 4, 108 S.Ct. 562; (2) under *Hazelwood*, a school has limited authority to censor school-sponsored student speech in a manner consistent with pedagogical concerns, 484 U.S. at 273, 108 S.Ct. 562; and (3) the *Tinker* standard applies to all other student speech and allows regulation only when the school reasonably believes that the speech will substantially and materially interfere with schoolwork or discipline, 393 U.S. at 513, 89 S.Ct. 733.

538 F.3d at 563-64 (footnote omitted). Accordingly, *Tinker* governs this case because by wearing clothing bearing images of the Confederate flag, Tom Defoe engaged in "pure speech," which is protected by the First Amendment, and thus *Fraser* would not apply; and the speech was not sponsored by the school, which means *Hazelwood* does not apply. *See id.* at 564 (internal quotation marks omitted). Thus, the inquiry in this case focuses on whether the record demonstrates "any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514.

The Supreme Court's decision in *Morse v. Frederick*, 551 U.S. 393 (2007), does not alter our application of the *Tinker* standard. Indeed, the Court in *Morse* reiterated that "schools may regulate some speech 'even though the government could not censor similar speech outside the school.'" 551 U.S. at 405-06. The Court also noted that "the rule of *Tinker* is not the only basis for restricting student speech." *Id.* at 406. As this Court has already recognized, however, the *Morse* holding was a narrow one, determining no more than that a public school may prohibit student expression at school or at school-sponsored events during school hours that can be "reasonably viewed as promoting drug use." *Id.* at 409-10.[5]

---

[5]In his concurrence, Justice Alito stated that he joined the *Morse* majority opinion

on the understanding that (a) it goes no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use and (b) it provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issues, including speech on issues

### 2.     Analysis under *Tinker* of the School District's Ban on Displays of the Confederate Flag

The district court granted summary judgment in favor of Defendants based on this Court's decision in *Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008).  In *Barr*, racial tensions at Blount County High School in Blount County, Tennessee prompted the principal to announce that displays of the Confederate flag were prohibited.  Two students who subsequently wore t-shirts to school displaying the Confederate flag sued after being told to remove or cover-up the t-shirts or face suspension.  The students alleged that the ban violated their free speech rights.

This Court upheld the district court's grant of summary judgment in favor of the school board on the basis that school officials reasonably forecast that displays of the Confederate flag would disrupt school work and discipline, and thus adhered to the *Tinker* standard.  In reaching this conclusion, the Court pointed to evidence in the record regarding racial violence, threats, and tension.  Specifically, the Court pointed to the following evidence: (1) a fight between an a black student and a white student; (2) a complaint filed with the Office of Civil Rights alleging that the school punished a black student more harshly than a white student following a racially-motivated altercation; (3) racist graffiti that included racial slurs and generalized threats against the lives of blacks; (4) "hit lists" of specific student names; (5) unspecified race-related fights; (6) a fear of racial violence that resulted in absenteeism among black students; and (7) a school "lockdown" implemented because of the deterioration of student discipline and the threat of race-related violence.  538 F.3d at 566-67.  The Court concluded that these occurrences established that school officials reasonably forecast that displays of the Confederate flag would likely disrupt the school environment.  *Id.* at 567.

Plaintiffs argue that the Confederate flag itself has not caused any disruption in the past at ACHS or ACCTC that would justify the ban.  However, as this Court stated

------

such as "the wisdom of the war on drugs or of legalizing marijuana for medicinal use."

551 U.S. at 422 (Alito, J., concurring).  Justice Alito also stated that he joined the majority opinion "on the understanding that the opinion does not hold that the special characteristics of the public schools necessarily justify . . . speech restrictions" beyond those recognized in *Tinker, Fraser,* and *Hazelwood. Id.* at 423.

in *Barr*, such an argument "misapplies the *Tinker* standard" because "*Tinker* does not require disruption to have actually occurred." 538 F.3d at 565 (quoting *Lowery v. Euverard*, 497 F.3d 584, 591, 593 (6th Cir. 2007)) (internal quotation marks omitted). Instead, the Court evaluates the circumstances to determine whether the school's forecast of substantial disruption was reasonable. *Id.*

> Under *Tinker*, "to justify prohibition of a particular expression of opinion," a school district must be able to show only "that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint," but rather, "that the school authorities had reason to anticipate that the wearing of [the banned imagery] would substantially interfere with the work of the school or would impinge upon the rights of other students," including the right "to be secure and to be let alone."

*Brogdon v. Lafon*, 217 F. App'x 518, 525 (6th Cir. 2007) (citations omitted).

Plaintiffs also argue that the district court erred in granting summary judgment by "erroneously conclud[ing] that 'ACHS and ACCTC have recently experienced intense racial conflict'" and that such a conclusion could not have been made without the court improperly weighing evidence and failing to grant all reasonable inferences in Plaintiffs' favor. (Appellant's Br. 19.) More specifically, Plaintiffs argue that the evidence demonstrates that racial tension is low at both ACHS and ACCTC. We disagree.

The record contains uncontested evidence of racial violence, threats, and tensions at both ACHS and ACCTC. At ACHS, several incidents have occurred: two days after two black male students enrolled at ACHS, a large Confederate flag appeared draped in a school hallway; racial slurs such as "dirty niggers, sand niggers and dirty mexicans" were directed at Hispanic students; racially-charged graffiti including a Swastika and the words "niggers" and "white power," and the comments "White 4 Life" and "I Hate Niggas, J/K AVM"; graffiti including the name of a racially mixed couple along with "something about nigger-lover, white girl, black boy, in my school" and a picture of a hangman's noose; a black Clinton High School student involved in a leadership program at ACHS being called a "nigger" by a group of white ACHS students; Oreo cookies

thrown onto the basketball court when a biracial Clinton High School basketball player attempted to warm-up before a basketball game; and a physical altercation between a Hispanic student and a white male student stemming from the white student's reference to the Hispanic student's brother as a "sand nigger, dirty mexican."

There is also uncontested evidence pertaining to incidents and the racial climate at ACCTC: a complaint from a black student's parent after the student was called a "nigger" on the school bus; a black student changing classes and transferring to Clinton High School based on his fear of a white student; incidents that occurred on ACCTC school buses stemming from racial epithets such as "nigger" and white students singing racial songs; a physical altercation resulting from a racial joke; a biracial female student being subjected to racist name-calling such that she "wanted to call home"; and difficulty recruiting minorities to ACCTC because potential minority recruits do not want to attend ACCTC due to racial tensions.

In addition, there is evidence of racial violence, threats, and tension at Clinton High School such as: racial graffiti including KKK references, and comments such as "I hate niggers," "Kill all the niggers," and "I hate this nigger-hating school. I'm going to blow it up"; the discovery of a noose in a student's locker along with stickers like "White Power," "KKK," and other racially-charged statements; and various unspecified race-related physical altercations.

Although some of the incidents of racial violence, threats, and tension present in *Barr* are not present here, uncontested evidence in this case clearly indicates racial violence, threats, and tension in Anderson County schools. Indeed, unlike in *Tinker*, Plaintiffs' free speech rights "colli[de] with the rights of other students to be secure and to be let alone," *Tinker*, 393 U.S. at 508, and this is not a situation where the prohibited speech "was entirely divorced from actually or potentially disruptive conduct by those participating in it." *Id.* at 505. In *Tinker*, the speech at issue communicated negative feelings about the Vietnam War whereas the speech at issue in this case communicates a message of hatred toward members of the student body population and, therefore, this case presents a situation "involv[ing] substantial disorder or invasion of the rights of

others . . . [which is] not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513.

"Even without evidence that Confederate flag displays had been the direct cause of past disruptions, school officials reasonably could surmise that such displays posed a substantial risk of provoking problems in the incendiary atmosphere then existing." *Brogdon*, 217 F. App'x at 523. Accordingly, even if a student's display of the Confederate flag has not actually disrupted the learning environment, "the district court nonetheless could conclude that displays of the confederate flag would be likely to lead to unrest in the future. Such a determination is not erroneous as either a factual finding or a legal conclusion." *Id.* at 524. Indeed, *Tinker* does not require that displays of the Confederate flag *in fact* cause substantial disruption or interference, but rather that school officials reasonably *forecasted* that such displays could cause substantial disruption or materially interfere with the learning environment. *Tinker*, 393 U.S. at 514.

Our holding today that school officials in this case reasonably forecast that permitting displays of the Confederate flag would substantially disrupt or materially interfere with the school environment accords with precedent not only from our own circuit, but from our sister circuits as well. *See A.M. ex rel McAllum v. Cash*, 585 F.3d 214, 223 (5th Cir. 2009) (concluding that the "racially inflammatory meaning associated with the Confederate flag and the evidence of racial tension at [the high school] establish[ed] that [school officials] reasonably forecast that [displays of the Confederate flag] might cause substantial disruption of school activities"); *B.W.A. v. Farmington R-7 Sch. Dist.*, 554 F.3d 734, 741 (2009) (upholding a school district's ban on clothing depicting the Confederate flag based on evidence of "likely racially-motivated violence, racial tension, and other altercations directly related to adverse race relations in the community and the school"); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366-67 (10th Cir.), *cert. denied*, 531 U.S. 825 (2000) (upholding a school district's clothing ban based on past racial incidents and a history of racial tension in the school district); *Melton v. Young*, 465 F.2d 1332, (6th Cir. 1972), *cert. denied*, 411 U.S. 951

(1973)  (upholding a school's code of conduct based on continued racial tension and physical altercations tied to displays of the Confederate flag).[6]

Because the evidence establishes that the *Tinker* standard is met, we conclude that school officials reasonably forecast that permitting displays of the Confederate flag would result in substantial disruption of, or material interference with, the school environment.  Such a conclusion is compelled by the racial violence, tension, and threats occurring in Anderson County schools as well as the fact that the Confederate flag is a "controversial racial and political symbol."  *Castorina v. Madison Cnty. Sch. Bd.*, 246 F.3d 536, 542 (6th Cir. 2001); *see Brogdon*, 217 F. App'x at 524 (noting the *Castorina* court's implicit acknowledgment that the Confederate flag is a controversial and political symbol).

### 3.    Alleged Viewpoint Discrimination

Plaintiffs also argue that the school district's policy constitutes unconstitutional viewpoint discrimination. Specifically, Plaintiffs argue that by banning displays of the Confederate flag, Defendants are suppressing a particular viewpoint they find offensive and they want to avoid offending others.

"It is true that even where past racial incidents justify a ban, schools may not impose 'a view-point specific ban on [some] racially divisive symbols and not others.'" *Brogdon*, 217 F. App'x at 523 (quoting *Castorina*, 246 F.3d at 544).  Indeed, "the prohibition of expression of one particular opinion, at least without evidence that it is

---

[6]The Eleventh Circuit has also upheld school districts' bans on displays of the Confederate flag, but have done so under both *Tinker* and *Fraser*.  *See, e.g., Scott v. Sch. Bd. of Alachua County*, 324 F.3d 1246, 1249 (11th Cir. 2003), *cert. denied*, 540 U.S. 824 (2003).  We decline, however, to view such cases as persuasive precedent.  We view displays of the Confederate flag by students as protected political speech that school officials may only regulate by satisfying the *Tinker* standard.  *See Barr*, 538 F.3d at 569 n.7.  In addition, the Third Circuit case cited by Plaintiffs, *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243 (3d Cir. 2002), *cert. denied*, 538 U.S. 1033 (2003), is distinguishable from the case at bar. In *Sypniewski*, the item of clothing involved did not depict a Confederate flag, but rather was a Jeff Foxworthy t-shirt that gave the "Top 10 reasons you might be a Redneck Sports Fan" and the *Sypniewski* court distinguished that case from cases like *West* and *Melton* on that basis, noting that the record did not suggest "any part of . . . Confederate flag clothing  other than the flag itself was seen as a provocative and offensive symbol" and thus, "little if any history of the use of the word 'redneck' that would support its ban." *Id.* at 249-50, 256.

necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible. *Tinker*, 393 U.S. at 511.

However, there is no evidence to suggest viewpoint discrimination in this case. The code of conduct prohibits all "[c]lothing and accessories such as backpacks, patches, jewelry, and notebooks" that display "(1) racial or ethnic slurs/symbols, (2) gang affiliations, (3) vulgar, subversive, or sexually suggestive language or images" as well as any displays promoting "products . . . students may not legally buy; such as alcohol, tobacco, and illegal drugs."[7] (Appellees' Br. 11.)

Plaintiffs tie no school officials to their claim of viewpoint discrimination, and testimony on this point shows that Malcolm X shirts are banned in Anderson County schools just as Confederate flag shirts are banned. At most, a couple of witnesses testified that various students "got away" with wearing Confederate flag clothing and there was limited testimony regarding one student wearing a flag with an image of the Mexican flag and someone wearing a Malcolm X shirt. There appears to be some ambiguity regarding whether school officials would act upon seeing a display of the Mexican flag but, unlike the Confederate flag and Malcolm X shirts, there is no district-wide ban on the Mexican flag's display nor is there any indication that it has been disruptive to the educational process or that school officials have reasonably forecasted that it would be.

---

[7] "[P]ublic education must prepare pupils for citizenship in the Republic. . . . It must inculcate the habits and manners of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation." *Fraser*, 478 U.S. at 681 (quoting C. Beard & M. Beard, NEW BASIC HISTORY OF THE UNITED STATES 228 (1968)). Of course, the "fundamental values of 'habits and manners of civility' essential to a democratic society must . . . include tolerance of divergent political and religious views, even when the views expressed may be unpopular." *Id.* However,

> these "fundamental values" must also take into account consideration of the sensibilities of others, and, in the case of a school, the sensibilities of fellow students. The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior. Even the most heated political discourse in a democratic society requires consideration for the personal sensibilities of the other participants and audiences.

*Id.* In light of Supreme Court precedent confirming the unique objective underlying public education and the fact that public school students do not have free-speech rights coextensive with those of adults, we believe that the prohibition of displays of racially divisive symbols, under the circumstances present in the instant case, constitutes a permissible content-based restriction on speech.

With regard to Plaintiffs' assertion that displays of the Confederate flag are banned based on their offensiveness rather than a reasonable forecast of disruption, that school officials "determined the Confederate flag to be *offensive* to African-American and other students . . . does not negate [their] reasonable belief that the flag was also *disruptive* and would cause substantial and material *interference* with schoolwork and school discipline." *Barr*, 538 F.3d at 567. Accordingly, we hold that Plaintiffs' viewpoint discrimination argument to be without merit.

### 4.    Narrow Tailoring Argument

Plaintiffs further argue that the school district's across-school ban is unconstitutional because speech restrictions must be narrowly tailored. Plaintiffs contend that because no principal or teacher can make exceptions to the ban based on the circumstances within individual schools and classrooms, the ban is unnecessarily broad and thus, violative of the Constitution.

Because the dress code's distinction between the display of racially divisive symbols and racially inclusive symbols involves "expressive conduct within the protection of the First Amendment," this provision of the dress code "must be [narrowly] tailored to serve a substantial governmental interest." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 99 (1972). In this case, the government's interest is the school district's objective of "educat[ing] its students in a learning environment conducive to fostering both knowledge and democratic responsibility," which is undoubtedly a substantial interest. *Barr*, 538 F.3d at 576.

In determining whether the dress code's ban on displays of racially divisive symbols is narrowly tailored we inquire as to whether this ban satisfies the *Tinker* standard. *See id.* Plaintiffs point to no authority for the proposition that the school district is required to apply district policy on a school-by-school or classroom-by-classroom basis. Not only would the piecemeal approach suggested by Plaintiffs be unworkable, but this Court appears to have implicitly rejected Plaintiffs' arguments that the narrow tailoring requirement prevents school districts from establishing and enforcing a district-wide dress code. *See Barr*, 538 F.3d at 556-57 (detailing the district-

wide dress code); *see also Brogdon*, 217 F. App'x 518, 526 (6th Cir. 2007) (affirming the district court's denial of a preliminary injunction in a case involving a district-wide dress code prohibiting attire that caused disruption to the educational process).  Other circuits have similarly upheld district-wide bans on displays of the Confederate flag. *See B.W.A.*, 554 F.3d at 741 (upholding a school district's ban on clothing depicting the Confederate flag); *West*, 206 F.3d at 1366-67 (same).

*Tinker* does not require an individualized analysis of each student's clothing each day, but rather a reasonable forecast by school officials that displays of the Confederate flag would cause disruptions.  *See Lowery*, 497 F.3d at 591-92 (holding that pursuant to *Tinker* school officials need not wait until a disruption actually occurs before regulating student speech).  As we have previously stated, Anderson County school officials enforce the ban in a viewpoint-neutral manner and only banned those symbols they have reasonably forecasted will substantially disrupt or materially interfere with schoolwork and school discipline.  Accordingly, we hold that the dress code's provision banning displays of racially divisive symbols, and its application to the Confederate flag, is narrowly tailored to the state and school district's substantial interest in educating students in the public school system.[8]

---

[8]Plaintiffs also assert that the Court's decision in *Barr* should be overturned because it is inconsistent with Supreme Court precedent and case law from our sister circuits.  In support of this argument, Plaintiffs filed a motion for initial hearing *en banc*, which was denied.  As this Court has previously stated, it is well-established that one panel cannot overrule a decision of another panel of this Court. *Salmi v. Sec'y of Health & Human Servs.*, 774 F.32d 685, 689 (6th Cir. 1985).  Moreover, as the analysis above indicates, *Barr* is consistent with Supreme Court precedent and cases from other circuits.  Plaintiffs argue in the alternative that the district court misapplied *Barr*, an argument that also fails for the reasons stated above.

## III.  CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court granting summary judgment in favor of Defendants.[9]

---

[9]In view of our holdings regarding Plaintiffs' claims, we decline to address Defendants' qualified immunity argument.

---

**CONCURRENCE**

---

ROGERS, Circuit Judge, concurring.[1] A public high school that can put reasonable limits on drug-related speech by students can put reasonable and even-handed limits on racially hostile or contemptuous speech, without having to show that such speech will result in disturbances. Expressions of racial hostility can be controlled in the public schools even if students in the attacked racial group happen to be mature, good-natured, and slow to react. Schools are places of learning and not cauldrons for racial conflict. Moreover, expression of racial hostility can be controlled in the public schools even though such expressions are constitutionally permitted in newspapers, public parks, and on the street. Public school students cannot simply decide not to go to school.

What amounts to racially hostile speech has to be determined in the first instance by school administrators. Students cannot attack such limits on the ground that their racially hostile speech was not intended to be hostile if the speech will clearly be taken as racially hostile, and schools must be able to draw some reasonably clear and understandable lines. Such limits are subject to attack in court only if a school's limits are not even-handed or if the school's limits are akin to the ban on anti-war armbands during the Vietnam War—expressions of dissent that are banned in essence because the administration disagrees with them.

Because these principles are firmly grounded in a fair reading of the key Supreme Court precedents dealing with school speech, it is not necessary in this case for the defendant schools to show that altercations or disruptions will occur if students are not allowed to wear clothes with Confederate flags on them.

The Supreme Court's recent decision in *Morse v. Frederick*, 551 U.S. 393 (2007), provides strong support for these conclusions. The Court in that case upheld discipline of a student for displaying—at a school activity—a banner that, albeit

---

[1]COOK, J., joins this opinion.

ambiguous, could easily be read to support drug use. The Court did not base this holding on any showing or reasonable forecast that allowing students to advocate drug use might cause "material or substantial disruption" in the parties' school. Rather, the Court deferred to the policy judgment of the school board that "deterring drug use by schoolchildren is an important—indeed, perhaps compelling interest." *Id.* at 407. Instead of reviewing the school's history (assuming there even was one) of disruptive events brought about by drug advocacy, the Court gave the school administrators discretion to combat the serious national problem of drug abuse in the way they chose—by banning its advocacy: "The special characteristics of the school environment and the governmental interest in stopping student drug abuse—reflected in the policies of Congress and myriad school boards, including JDHS—allow schools to restrict student expression that they reasonably regard as promoting illegal drug use." *Id.* at 408. If we substitute "racial conflict" or "racial hostility" for "drug abuse," the analysis in *Morse* is practically on all fours with this case. The inescapable conclusion is that a school may restrict racially hostile or contemptuous speech in school, when school administrators reasonably view the speech as racially hostile or promoting racial conflict.

A dress code that bans such displays—including displays of symbols to the same effect—could thus permissibly ban displays of the Confederate flag. The Confederate battle flag, it is true, may convey a noble message, for instance to signify honor for one's ancestors who fought bravely with their state compatriots for independence from the industrial North. But the Confederate flag on a T-shirt is doubtless *perceived* by many, if not most, student viewers in today's high schools in the United States as a statement of racial hostility—comparable to a slogan that says "Blacks should be slaves" or "Blacks are inferior." *See Scott v. Sch. Bd. of Alachua County*, 324 F.3d 1246, 1248-49 (11th Cir. 2003). The reader who somehow doubts this must at least concede that reasonable school administrators could reasonably so conclude. The Supreme Court reasoned similarly in *Morse*, which involved a banner stating "BONG HiTS 4 JESUS." The Court recognized that the banner could be read as advocating drug use, or as "celebrating" drug use, or as silly nonsense. *Morse*, 551 U.S. at 402. Nonetheless, because the school principal could read the banner as advocating drug use, the principal

could suspend the student where the principal's interpretation was "plainly a reasonable one." *Id.* at 401.   A plainly reasonable interpretation of a Confederate flag T-shirt or jacket is one of racial hostility or contempt, regardless of the subjective intent of the wearer.  And even if the individual student meant no such hostility or contempt, a school administrator cannot practically administer a rule that permits such clothing sometimes and prohibits it other times, depending on the intent of each individual wearer.

*Morse* furthermore distilled two basic principles—applicable to school speech cases in general—from the Court's earlier decisions in *Tinker v. Des Moines Independent School District*, 393 U.S. 503 (1969), and *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986).  First, "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Morse*, 551 U.S. at 404-05 (quoting *Fraser*, 478 U.S. at 682).  Thus drug use may be advocated on the streets and in the public square, but not in the public schools.  Similarly, racial contempt can be advocated on the streets and in the public square, but not necessarily in the public schools.  The Supreme Court in *Morse* reiterated the special nature of the school setting: "the nature of [constitutional] rights is what is appropriate for children in school" and constitutional rights "are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." *Id.* at 406 (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995)).

Just as the Supreme Court went on to recognize an "important, perhaps compelling" interest in deterring drug use in the schools, there is of course a comparably "important, perhaps compelling" interest in reducing racial tension in the public schools. Racial tension obviously interferes with learning in ways that even strongly-held political views do not.  Anger, hostility, and contempt are not elements of a sound learning strategy, or school administrators could at least so conclude.  In addition, students do not generally attend public schools by choice—they have to be there.  They cannot avoid racially demeaning slogans and symbols by staying elsewhere; they can

only rely on school administrators to create a learning environment clear of racial hostility or contempt.

The second basic principle derived by the *Morse* Court from *Tinker* and *Fraser* is that "the mode of analysis set forth in *Tinker* is not absolute." *Morse*, 551 U.S. at 405. In other words, although the *Tinker* Court held unconstitutional a school ban on anti-Vietnam War armbands where the school had not shown that "substantial disruption" would occur at the school, a "substantial disruption" requirement does not always apply to school speech cases. Just as in *Morse*, *Tinker* is distinguishable from this case. *Tinker* involved a school administration that disagreed with the anti-war message of the armband, and sought to justify a ban based on the mere possibility of disruption. Just as the danger of drug use is "far more serious and palpable" than the flimsy rationale put forward in *Tinker*, *Morse*, 551 U.S. at 408, the danger of racial hostility and mutual student contempt is also "far more serious and palpable" than the pretext in *Tinker*. To keep students from wearing racially hostile slogans or symbols obviously reflects a "particular concern . . . [that] extends well beyond an abstract desire to avoid controversy." *Id.* at 408-09.

A fair reading of *Morse*, then, in connection with a recognition that racial tension in today's public schools is a concern on the order of the problem of drug abuse, leads to the conclusion that a dress code that forbids racially hostile slogans and symbols—if fairly applied—comports with the First Amendment even without a so-called *Tinker* showing of a reasonable forecast of substantial disruption. For this reason, affirmance is required in this case. It is clear that no *Tinker* showing was required in *Morse*, and such a showing is not required in this case.

It might be possible for us to uphold the school's policy in this case by finding a sufficient threat of the "substantial disruption" required in *Tinker*, as we did in *Barr v. LaFon*, 538 F.3d 554 (6th Cir. 2008). Two concerns counsel against such a course. First, the evidence of potential disruption in *Barr* was more consistent and compelling than in this case. While there have been troublesome racial incidents in the Anderson County schools in the past, there was also some testimony to the effect that the wearing

of a Confederate flag would not cause disruption.[2]   For us to uphold a summary judgment in favor of the school board, there must be no genuine issue of material fact. If the school must after all show a reasonable forecast of "substantial disruption," then it is at least questionable whether summary judgment for the school was appropriate. Second, because the law does not require a *Tinker* showing of a reasonable forecast of "substantial disruption" in the context of this case, it would be a waste to have a trial to determine whether there is such a threat.  In general, moreover, it would be a waste for school boards to have to find instances of racial altercations in order to justify a dress-code ban on racially hostile slogans and symbols.  On the other hand, it would be illogical to require school administrators to allow racially hostile or contemptuous slogans and symbols just because those who are demeaned or insulted are responsible, mature, or slow to anger.

It is true that in *Barr* we stated that, while a school may categorically prohibit vulgar or lewd speech under *Fraser*, and censor school-sponsored student speech under *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), "the *Tinker* standard applies to all other student speech." *Barr*, 538 F.3d at 564.  Because in *Barr* we found that the *Tinker* standard was met, this statement was not necessary to our decision in *Barr*.  Moreover, the sweeping statement is not consistent with the Supreme Court's then-recent decision in *Morse*, since the speech in *Morse* fell in neither exception and *Tinker* was not applied.[3]

---

[2]*See, e.g.,* R. 50-5, Depo. Landrum at 22 (Q: "But you said that last year, it wouldn't have been likely to cause a disruption in your class?" A: "Probably not."); R. 50-6, Depo. Anderson at 11 (Q: "Would you say that Tom's display of the confederate flag would be likely to cause a disruption in your class?" A: "In my class, no."); *id.* at 12 (Q: "Knowing what you know about the school, is Tom's display of the confederate flag in that school likely to cause a disruption?" A: "Not in that school."); R. 50-12, Depo. Deal at 32-33 (Q: "[W]ould you expect a disruption to occur in the school because of the confederate flag's presence?" . . . A: "Probably not."); R. 50-13, Depo. Stonecipher at 25-26 (Q: "Would you say that if the confederate flag was allowed in the school tomorrow, in Clinton High School, do you think it would be likely to cause a disruption?" . . . A: "More than likely." Q: "Okay.  Would you say that's true of every school in the District?" . . . A: "No, sir." Q: "What schools do you think it wouldn't cause a problem in?" . . . A: "It wouldn't cause a problem in those schools that have zero minority population.").

[3]*Castorina v. Madison County School Board*, 246 F.3d 536, 541-44 (6th Cir. 2001), contains some similar reasoning to the statement in *Barr*, but *Castorina* preceded the Supreme Court's decision in *Morse*.

The *Barr* opinion does refer to *Morse*, but reads *Morse* as categorically limited to speech promoting illegal drug use. *Barr*, 538 F.3d at 564. But it is not at all clear that *Tinker* must be read as providing the general rule for all student speech, limited only by subsequent categorical "exceptions" to that general rule. *Morse* actually suggests the opposite: "the mode of analysis set forth in *Tinker* is not absolute." *Morse*, 551 U.S. at 405.

*Morse* thus makes clear that *Fraser* is not just an exception narrowly limited to lewd speech, but has more general applicability. *Fraser* explained that public schools have the duty to promote the "fundamental values necessary to the maintenance of a democratic political system," and explicitly recognized that such values "must also take into account consideration of the sensibilities of others, *and, in the case of a school, the sensibilities of fellow students.*" *Fraser*, 478 U.S. at 681 (emphasis added). Given the widespread perception of the Confederate flag as a symbol of white superiority, schools could easily view wearing one to be at least as damaging to student sensibilities as Matthew Fraser's speech "glorifying male sexuality." *Id.* at 683. In upholding Fraser's suspension, the Court made the schools' supervisory role very clear: "The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech or conduct such as that indulged in by this confused boy." *Id. Morse* confirmed that such determinations do not require *Tinker*-style "substantial disruption" showings. The Court in *Morse* explicitly stated that "[w]hatever approach *Fraser* employed, it certainly did not conduct the 'substantial disruption' analysis prescribed by *Tinker*." 551 U.S. at 405.

A fair look at *Tinker*, *Fraser*, *Hazelwood*, and *Morse* thus suggests that the general rule is that school administrators can limit speech in a reasonable fashion to further important policies at the heart of public education. *Tinker* provides the exception—schools cannot go so far as to limit nondisruptive discussion of political or social issues that the administration finds distasteful or wrong. Drawing such a line may be difficult, but it must be left as a practical matter first to school administrators, with

resort to the courts always available for cases like *Tinker* where the school goes too far. The present case is clearly different from *Tinker*.

These reasons warrant our affirmance of the judgment of the district court.