RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0066p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

TOM DEFOE, a minor by and through his
parent and guardian Phil Defoe; PHIL DEFOE,
                               *Plaintiffs-Appellants,*

            *v.*

SID SPIVA, in his individual and official
capacity as Principal of Anderson County
Career and Technical School; MERL KRULL,
in his individual and official capacity as
Assistant Principal of Anderson County
Vocational and Technical School; GREG
DEAL, in his individual and official capacity
as Principal of Anderson County High
School; V. L. STONECIPHER, in his official
capacity as Director of Schools for Anderson
County; JOHN BURRELL, in his official
capacity as Chairman of the Anderson County
School Board; ANDERSON COUNTY SCHOOL
BOARD,
                               *Defendants-Appellees.*

No. 09-6080

Filed: March 14, 2011

Before: CLAY, ROGERS, and COOK, Circuit Judges.

_____

**ORDER**

_____

The court having received a petition for rehearing en banc, and the petition having been circulated not only to the original panel members but also to all other active judges of this court, and less than a majority of the judges having favored the suggestion, the petition for rehearing has been referred to the original panel.

The panel has further reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision of the case.  Accordingly, the petition is denied.

BOGGS, Circuit Judge, dissenting from the denial of rehearing en banc. The panel majority eviscerates the core holding of *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969)—that student speech can be suppressed only based on its disruptive potential, not on its content. 393 U.S. at 509. There is no indication in *Tinker* that its rules are any different if the speech at issue is deemed, by either a school or an appellate court, to be offensive, "hostile," or "contemptuous." *See Defoe v. Spiva*, 625 F.3d 324, 338 (6th Cir. 2010). Nor is there any indication that such a judgment would change the basic First Amendment values that *Tinker* enshrines. *See Tinker*, 393 U.S. at 511–13.

The panel majority rests its remarkable conclusion on *Morse v. Frederick*, 551 U.S. 393 (2007), where the Court found the speech in question—a 14-foot banner with the message "BONG HiTS 4 JESUS"—to be promoting illegal drug use. 551 U.S. at 397, 402. The majority does so despite the clear warnings in *Morse*, especially in Justice Alito's decisive concurring opinion, that the Court was *not* undermining the basic holding of *Tinker*, but was simply allowing an exception for speech promoting drug use, which is both illegal and directly contrary to a tenet of the school system. 551 U.S. at 408–09; *id.* at 423, 425 (Alito, J., concurring). *Morse* does not give the slightest hint that schools are authorized to suppress any speech that either they or an appellate court deems contrary to the school's "mission" or "core values."

Wholly disregarding these warnings, the majority opinion asserts that this case is controlled by *Morse* because "racially hostile or contemptuous" can be substituted for "illegal drug use." *Defoe*, 625 F.3d at 338–39 ("If we substitute 'racial conflict' or 'racial hostility' for 'drug abuse,' the analysis in Morse is practically on all fours with this case."). That is grammatically true, but it is equally true if you substitute "religious dogma," "Republican propaganda," or "seditious libel." *Morse* does not authorize suppression on any of those grounds either, but the panel's *ipse dixit* reading of *Morse* would support such a holding just as strongly as the one it makes.

The faults of the majority opinion are many, as ably pointed out in the amicus brief of the ACLU. I wish to highlight a few.

The majority's test was nowhere argued either at the district court or in the briefing to the panel. No claim was ever made that speech could be banned simply because an appellate court found it to be, *as a matter of law*, "racially hostile and contemptuous." *See id*. at 338. The school made no claim on that basis, nor did it claim that the Confederate emblems in play here were such.

I emphasis the phrase "as a matter of law" because the proposition that the symbol at issue is "racially hostile and contemptuous" was never put to a test in the district court. Presumably it would otherwise be a matter of *fact* as to what the student plaintiffs actually meant by the symbol, or perhaps expert opinions by semioticians could reveal its abstract meaning. One would think that context would make some difference—a Confederate flag on a book cover might be thought of as different in meaning than a Confederate flag accompanied by "forget, Hell" text, as in some cartoons. Or, if displayed crossed with a Union flag, perhaps which flag was on top would make a difference in meaning and, accordingly, in any judgments of hostility and contemptibility. But the panel never hints at such distinctions. It simply upholds the ban based on its own interpretation of the symbol as "racially hostile and contemptuous." The panel may be right under some circumstances. But none were proven or adduced here.

Next, the very basis of "racially hostile" is both undefined and unlimited. Is it only what an appellate court determines to be "race?" Many authorities have stated that term to be scientifically meaningless and only a social construct. *See generally Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 610 n.4 (1987); *Ho v. San Francisco Unified Sch. Dist.*, 147 F.3d 854, 863 (9th Cir. 1998). How, then, does the panel opinion limit "race?" We are given no answers. Does it apply also to what some regard as religion? Jews, for example, have been considered a "race" in much literature in this country. Does it apply to purely religious symbology, such as a "Christ fish" swallowing a "Darwin fish" or vice versa? And certainly the use of some religious symbols, such

as the controversial cartoon of Mohammed with a bomb in his turban, could be considered religiously hostile or contemptuous. *See Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 21 (D.D.C. 2010). Further, national origin is considered by many to be racial. Is an American flag "racially" hostile to recent immigrants or Native Americans? *See* Lindsay Bryant, *Five Morgan Hill students sent home for wearing American flag T-shirts*, MORGAN HILL TIMES, May 5, 2010; *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse - Wisconsin, Inc*., 843 F. Supp. 1284, 1289 (W.D. Wisc. 1994). Is a Mexican flag in an American public school "racially hostile" to those whom, in some places, are called "Anglos?" *See Defoe*, 625 F.3d at 337 (Clay, J., concurring) (describing uncertainty as to whether students were allowed to wear Mexican flags).

Or is the real inquiry into hostility? Does "hostility" encompass political views? Surely, the Second Circuit did not appear to think so in *Guiles v. Marineau*, 461 F.3d 320 (2006), where the image of a drug-snorting, cowardly American president could hardly have been more contemptuous of both the person and his supporters. 461 F.3d at 322, 330. But that case was pre-*Morse*, and the majority opinion here does nothing to rule out a contrary result. Similarly, t-shirts with legends of Che Guevara or Mao Tse-Tung could certainly be taken by many as displaying hostility and contempt toward their victims and the victims' supporters or descendents. May those images too be banned?

Finally, I would note that a religious service I recently attended included a congregant wearing a "redneck IQ test" t-shirt that might well be considered hostile and contemptuous by some of the very students involved in this litigation. *See Defoe*, 625 F.3d at 327 (Clay, J., concurring).

Surely what is revealed by these examples—and the total unwillingness of the majority to even approach them—is that the law in the Sixth Circuit is now that "nice symbols" (e.g., black armbands, which I imagine the majority would concede are still controlled by *Tinker*) must be permitted, but "naughty symbols" (e.g., the Confederate flag) can be banned without further analysis. This is directly contrary to *Tinker* and, indeed, to *any* type of fidelity to First Amendment doctrine. *Tinker* itself shows this.

The Court had no interest at all in whether the black armbands at issue meant "I am a nice pacifist" or, directed toward the children of servicemen, "your daddy is a war criminal."

*Tinker* is certainly subject to criticism, as the *Tinker* dissenters, including so staunch a civil libertarian as Justice Black, noted vigorously. 393 U.S. at 526 (Black, J., dissenting) ("I wish, therefore, wholly to disclaim any purpose on my part to hold that the Federal Constitution compels the teachers, parents, and elected school officials to surrender control of the American public school system to public school students. I dissent.").

But *Tinker* is the law, and the majority opinion flatly departs from it. Why, then, should we not address en banc so egregious an error? Some might think that the Supreme Court has caused this confusion and we should let the justices sort it out. Others may think that it is unseemly to be on the same side as flaunters of the Confederate flag. But the latter view has never kept American courts from judging First Amendment issues neutrally, even where the immediate beneficiaries were Communists, Nazis, or fascists. *Schneider v. Smith*, 390 U.S. 17 (1968); *Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43 (1977); *Terminiello v. City of Chicago*, 337 U.S. 1 (1949); *see United States v. Schwimmer*, 279 U.S. 644, 654–55 (Holmes, J., dissenting) ("[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate.").

I would apply *Tinker* and *Morse* at face value and neutrally, and I believe the majority's failure to do so is sufficiently important that this case should be reheard en banc. I therefore respectfully dissent.[1]

ENTERED BY ORDER OF THE COURT


/s/ Leonard Green

_____
          Clerk

---

[1]The concurrence's alternate basis for affirmance is also flawed. Under the correct *Tinker* standard, summary judgment was inappropriate in this case, and the majority appeared to agree:

> While there have been troublesome racial incidents in the Anderson County schools in the past, there was also some testimony to the effect that the wearing of a Confederate flag would not cause disruption. For us to uphold a summary judgment in favor of the school board, there must be no genuine issue of material fact. If the school must after all show a reasonable forecast of "substantial disruption," then it is at least questionable whether summary judgment for the school was appropriate.

*Defoe*, 625 F.3d at 341. In this case, the evidence to support a summary judgment as to a reasonable forecast of substantial disruption is even weaker than in the questionable case of *Barr v. Lafon*. *See* 553 F.3d 463, 464–67 (6th Cir. 2009) (Boggs, J., dissenting from denial of rehearing en banc).