PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CANDICE MICHELLE HARDWICK, by
and through her Parents and
Guardians Daryl Lewis Hardwick
and Priscilla Lea Hardwick,

*Plaintiff-Appellant,*

v.

MARTHA HEYWARD, in her
individual capacity and in her
official capacity as Principal of
Latta Middle School; GEORGE H.
LIEBENROOD, JR., in his individual
capacity and in his official
capacity as Principal of Latta High
School; BOARD OF TRUSTEES OF
LATTA SCHOOL DISTRICT DILLON
COUNTY NO. 3,

*Defendants-Appellees.*

No. 12-1445

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Terry L. Wooten, District Judge.
(4:06-cv-01042-TLW)

Argued: January 30, 2013

Decided: March 25, 2013

Before NIEMEYER, SHEDD, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Shedd wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

---

## COUNSEL

**ARGUED:** Frederick Daniel Taylor, STALLINGS, BUSH & RANDALL, PC, Suffolk, Virginia, for Appellant. Vinton D. Lide, LIDE & PAULEY, LLC, Lexington, South Carolina, for Appellees. **ON BRIEF:** Kirk D. Lyons, SOUTHERN LEGAL RESOURCE CENTER, INC., Black Mountain, North Carolina; Lourie A. Salley, III, Lexington, South Carolina, for Appellant. Michael S. Pauley, LIDE & PAULEY, LLC, Lexington, South Carolina; Vernie L. Williams, CHILDS & HALLIGAN, Columbia, South Carolina, for Appellees.

---

## OPINION

SHEDD, Circuit Judge:

On multiple occasions at Latta Middle School and Latta High School in Latta, South Carolina, school officials prohibited Candice Hardwick from wearing and on one occasion punished her for wearing Confederate flag[1] shirts at school. Candice Hardwick, by and through her parents, brought this action against the school principals and the school board pursuant to 42 U.S.C. § 1983, alleging violations of her First Amendment right to free speech and expression and her Fourteenth Amendment rights to due process and equal protection. The district court granted summary judgment to the defendants, and Candice Hardwick now appeals. Because we con-

---

[1]Throughout this opinion, we refer to the Confederate battle flag simply as the "Confederate flag." We refer to other Confederate flags by their specific names.

clude that the school officials complied with the requirements for regulating student speech as established in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), and that the school dress codes and their enforcement did not violate the Fourteenth Amendment, we affirm.

## I.

We review the facts in the light most favorable to Candice Hardwick, the nonmoving party. *See Laing v. Fed. Express Corp.*, 703 F.3d 713, 714 (4th Cir. 2013).

## A.

Candice Hardwick grew up in Dillon County, South Carolina. She attended Latta Middle School during the 2002-03 and 2003-04 school years before attending Latta High School during the 2004-05 and 2005-06 school years. Both schools are located in Latta, a town of about 1,400 people. These schools are part of the Latta School District,[2] which had a student population of approximately 1,600 students, almost equally divided between whites and African-Americans, during the time Candice attended Latta schools.

Latta Middle School and Latta High School have dress codes that regulate what clothing students may wear at school. The relevant portion of the middle school policy states, "Generally, student dress is considered appropriate as long as it does not distract others, interfere with the instructional programs, or otherwise cause disruption." J.A. 38. The policy then provides "some examples that are judged to be inappropriate or distracting in the educational setting," which includes "clothing that displays profane language, drugs, tobacco, or alcohol advertisements, sexual innuendoes or anything else deemed to be offensive." J.A. 39. Similarly, the relevant part of the high school policy provides that "students

---

[2]The district is also known as Dillon County School District 3.

are to come to school in a neat and clean manner each day. Dress is casual, but some styles, which may be appropriate outside of school, are clearly inappropriate for school. Students may not wear the following: . . . Shirts with obscene/derogatory sayings." J.A. 45.

Starting during the 2002-03 school year at the middle school, school officials on multiple occasions forced Candice to remove Confederate flag shirts and on one occasion punished her for wearing those shirts. The first incident came in early 2003, when Martha Heyward, principal of the middle school, required Candice to remove her "Southern Chicks" shirt, which displayed the Confederate flag. *See* J.A. 46.

More incidents occurred during the 2003-04 school year. On one occasion in January 2004, a teacher required Candice to cover up a "Dixie Angels" shirt, which displayed the Confederate flag. *See* J.A. 47. In early February, Heyward removed Candice from class for wearing a "Southern Girls" shirt, which, like the previous two shirts, displayed the Confederate flag. *See* J.A. 48. Then in mid-February, Candice was sent to the school office and forced to change shirts when she wore a shirt honoring "Black Confederates" that displayed a Confederate flag and a picture of the 1st Louisiana Native Guards, a Confederate regiment consisting mostly of free African-Americans. *See* J.A. 49. Shortly after this incident, Heyward refused to let Candice wear what Candice labeled a "protest shirt," which displayed the American flag with the words "Old Glory" above the flag and "Flew over legalized slavery for 90 years!" underneath it. *See* J.A. 50. In late February, when Candice wore a shirt with a picture of Robert E. Lee and the Confederate flag, Candice refused to change shirts and was given in-school suspension. *See* J.A. 51. Finally, in March, Candice was forced to change a "Girls Rule" shirt that, like her other shirts, displayed the Confederate flag. *See* J.A. 52.

After this series of incidents, Candice's parents sent John Kirby, the superintendent of the school district, a letter stating that Candice's clothing was approved by them and reflected Candice's family heritage and religious beliefs. Harold Kornblut, the chairman of the school board, responded to this letter, explaining that based on a long history of racial tension and the potential for different interpretations of the meaning of the Confederate flag, school officials could prohibit clothing that contained images of that flag. At some time during this exchange of letters, Candice wore a shirt at school after school hours that said "Offended by School Censorship of Southern Heritage," resulting in a school official yelling at her. *See* J.A. 89.[3]

When Candice began high school in the 2004-05 school year, the controversy over her Confederate flag shirts continued. Candice's parents and Kornblut again exchanged letters in the fall of 2004. Candice's parents asked Kornblut to reconsider the school board's position that Candice could not wear Confederate flag shirts at school. Kornblut's response reaffirmed the school board's position that such clothing was likely to cause a disruption at school and was thus prohibited.

In May of that school year, George Liebenrood, principal of the high school, removed Candice from class for wearing a shirt that read "Daddy's Little Redneck" and displayed the Confederate flag. *See* J.A. 99. In Liebenrood's presence, Candice then produced four more "protest shirts," each of which Liebenrood prohibited Candice from wearing: (1) a shirt saying "Jesus and the Confederate Battle Flag: Banned from Our Schools but Forever in Our Hearts" that displayed the first Confederate national flag, commonly known as the "Stars and Bars," the Bonnie Blue flag, the third Confederate national flag,[4]

---

[3]Although this shirt does not display a Confederate flag as clearly as some of the other shirts that Candice wore, the lettering has the red, white, and blue coloring of the Confederate flag and resembles the familiar diagonal cross of the flag.

[4]This flag is a white banner with the Confederate battle flag in the upper-left-hand corner, which has the censor symbol over it as depicted on this shirt, and a vertical red stripe on the far right side of the flag.

and a Confederate battle flag with the censor symbol over it, *see* J.A. 100; (2) a shirt saying "Honorary Member of the FBI: Federal Bigot Institutions," *see* J.A. 101; (3) a shirt saying "Our School Supports Freedom of Speech for All (Except Southerners)," *see* J.A. 102; and (4) a shirt saying "Public Schools Should Educate Not Discriminate Against Southern Heritage," *see* J.A. 103.[5]

Candice's conflict with school officials continued in the 2005-06 school year. At the beginning of that school year, Candice wore a shirt with a picture of the South Carolina State House grounds that included the Confederate flag, which flies on the State House grounds. *See* J.A. 104. Candice wore this shirt "for several days" before Liebenrood learned of it, at which time he made her change shirts. J.A. 24. This was the last time Candice wore a Confederate flag shirt at school.

After a final attempt in the spring of 2006 to have the school board change its position on the acceptability of Confederate flag shirts at school, Candice, by and through her parents, filed this action pursuant to 42 U.S.C. § 1983 against Heyward, Liebenrood, and the Board of Trustees of the Latta School District. Candice claimed that her First Amendment right to free speech and expression was violated because she was not allowed to wear the Confederate flag shirts or protest shirts; that her Fourteenth Amendment right to due process was violated because the schools' dress codes are overbroad and vague; and that her Fourteenth Amendment right to equal protection was violated because the school officials specifically targeted her Confederate flag shirts while not punishing other racially themed shirts.

The defendants filed a motion for summary judgment, and

---

[5]The lettering on these last three so-called protest shirts is the same style as the lettering on the "Offended by School Censorship of Southern Heritage" shirt. *See supra* note 3.

the affidavits and depositions of the school officials filed with this motion reveal the basis on which the school officials prohibited Candice from wearing her Confederate flag shirts and protest shirts. For generations before integration in the 1970-71 school year, whites and African-Americans in Latta had "lived culturally and financially separate [lives]," and integration "made life in [Latta] drastically different." J.A. 124. Although school officials have recognized an improvement in race relations since integration,[6] they also stated that "there has always been, and continues to be, an underlying, mostly unspoken, prejudice between [Latta's] white and black students." J.A. 132–33.

Various racial incidents in Latta schools illustrate this racial tension. For instance, in the mid-1980s, a white student and an African-American student attended the prom together, causing "small groups of whites and blacks . . . to stir up trouble," which included white students wearing Confederate flag apparel and African-American students wearing Malcolm X apparel. J.A. 128. Less than a decade later in the early 1990s, the Confederate flag again caused commotion when a student drove through the school parking lot with a Confederate flag on his truck. Then, in the mid-1990s, two high school students burned one of the historic African-American churches in the area. The Confederate flag caused more "issues" and created a "very tense" situation between white and African-American students during the debate in 2000 over whether the flag should continue flying on the State House dome.[7] J.A. 502.

More recent examples that occurred during or after Candice's time at the middle school and high school demonstrate

[6]For example, Latta High School no longer has separate proms and homecoming queens for whites and African-Americans, both of which existed until the 1980s.

[7]The Confederate flag flew atop the State House dome from the early 1960s until 2000, when it was moved to its current location on a thirty-foot flagpole near the Confederate monument on the State House grounds.

continued racial tension in Latta schools. Heyward described an incident involving a Confederate flag that led to a disruption of a classroom in which the teacher had to calm the class down in response to the flag. Another incident involving the Confederate flag took place in 2009, when a student wore a Confederate flag belt buckle, prompting another student who saw the belt buckle to say, "If you don't take that belt off, we're going to take it off of you." J.A. 503.

B.

In 2009, the district court granted summary judgment to the defendants on Candice's First Amendment claim based on the Confederate flag shirts and on her Fourteenth Amendment equal protection and due process claims. *Hardwick ex rel. Hardwick v. Heyward*, 674 F. Supp. 2d 725 (D.S.C. 2009). Candice appealed, but we concluded that we lacked jurisdiction because the district court's opinion did not address all of Candice's claims—specifically, her claims related to the protest shirts—making the appeal "interlocutory in nature." *C.H. ex rel. Hardwick v. Heyward*, 404 F. App'x 765, 768 (4th Cir. 2010) (per curiam) (quoting *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003)). We therefore dismissed the appeal and remanded the case for further proceedings. *Id.*

On remand, the district court granted summary judgment to the defendants on Candice's First Amendment claim based on the protest shirts and reaffirmed its previous grant of summary judgment to the defendants on Candice's Fourteenth Amendment claims, thereby disposing of all claims in this case.[8] *Hardwick ex rel. Hardwick v. Heyward*, 2012 WL 761249 (D.S.C. Mar. 8, 2012). Candice timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

---

[8]Additionally, the district court concluded that the individual defendants, Heyward and Liebenrood, were entitled to qualified immunity. Because we conclude that Candice's constitutional rights were not violated, we do not address the qualified immunity issue.

## II.

We review a grant of summary judgment *de novo*, "applying the same legal standards as the district court." *Pueschel v. Peters*, 577 F.3d 558, 563 (4th Cir. 2009). Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," based on the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56. At this stage, we must view all evidence in the light most favorable to the nonmoving party. *Rowzie v. Allstate Ins. Co.*, 556 F.3d 165, 167 (4th Cir. 2009). In conducting our review, we do not "weigh the evidence," but rather we only determine "whether there is a genuine issue for trial." *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

On appeal, Candice challenges the district court's decision to grant summary judgment to the defendants on both her First and Fourteenth Amendment claims. We address each in turn.

## III.

We turn first to Candice's claim that the defendants violated her First Amendment right to free speech and expression by refusing to let her wear Confederate flag shirts and protest shirts.

## A.

We start with the fundamental principle that the First Amendment prohibits Congress and, through the Fourteenth

Amendment, the states from "abridging the freedom of speech." U.S. Const. amend. I; *Gitlow v. New York*, 268 U.S. 652, 666 (1925). Although students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker*, 393 U.S. at 506, "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986); *see also Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988).

The Supreme Court's landmark decision in *Tinker v. Des Moines Independent Community School District* established the basic framework governing student speech.[9] In that case, a group of students wore black armbands to school to protest the Vietnam War, and school officials, pursuant to the policy they adopted once they learned of the plan to wear armbands, suspended the students. *Tinker*, 393 U.S. at 504. Interpreting the First Amendment "in light of the special characteristics of the school environment," *id.* at 506, the Court held that school officials may prohibit or punish student speech that would "'materially and substantially interfer[e] with the requirements of appropriate discipline in the operation of the school' [or] collid[e] with the rights of others." *Id.* at 513 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)). School officials may regulate such speech even before it occurs, as long as they can point to "facts which might reasonably have led [them] to forecast" such a disruption. *Tinker*, 393 U.S. at 514. School officials may not, however, punish speech based on only an "undifferentiated fear or apprehension of disturbance" or "a mere desire to avoid the discomfort and unpleas-

---

[9]We have indicated that *Tinker* does not apply to "a neutral time, place, and manner restriction" that a school imposes. *See Glover v. Cole*, 762 F.2d 1197, 1203 (4th Cir. 1985); *see also Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 443 (5th Cir. 2001) (applying the framework of *United States v. O'Brien*, 391 U.S. 367 (1968), to a content-neutral regulation of speech). The dress codes in the Latta schools are not content neutral, so in our review of the framework of student-speech law, we do not consider this issue.

antness that always accompany an unpopular viewpoint." *Id.* at 508, 509.

Applying these principles to the facts of *Tinker*, the Court held that suspending the students violated their First Amendment rights. The school officials had no "reason to anticipate that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students." *Id.* at 509. Instead, their decision appeared "based upon an urgent wish to avoid the controversy which might result from the [students'] expression." *Id.* at 510. Thus, the suspensions could not pass constitutional muster. *Id.* at 514.

Although *Tinker* provides the basic constitutional framework for reviewing student speech, the Supreme Court has created three exceptions to *Tinker* in which school officials may regulate student speech without undertaking *Tinker*'s substantial-disruption analysis. First, school officials can "prohibit the use of vulgar and offensive terms" as part of their role in teaching students the "fundamental values of 'habits and manners of civility' essential to a democratic society." *Fraser*, 478 U.S. at 683, 681.[10] Second, school officials have greater latitude to regulate student speech when the school "lend[s] its name and resources to the dissemination of student expression" such that "students, parents, and members of the public might reasonably perceive [that student expression] to bear the imprimatur of the school." *Kuhlmeier*, 484 U.S. at 272–73, 271. Third, school officials can regulate student speech that can plausibly be interpreted as promoting

---

[10]In interpreting *Fraser*, we have stated, "When speech in school falls within the lewd, vulgar, and plainly offensive rubric, it can be said that *Fraser* limits the form and manner of speech, but does not address the content of the message." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 256 (4th Cir. 2003). Because we do not rely on *Fraser*, the line between the manner of speech and the content of speech is of no import here.

illegal drugs because of "the dangers of illegal drug use." *Morse v. Frederick*, 551 U.S. 393, 410 (2007).[11]

## B.

Like other student-speech cases, we have recognized that the legal question raised by students' desire to have potentially controversial items, such as Confederate flag apparel, in schools is "not frivolous." *Crosby by Crosby v. Holsinger*,

---

[11]Although we briefly mentioned *Morse* in *Kowalski v. Berkeley County Schools*, 652 F.3d 565, 571 (4th Cir. 2011), we have not expressly discussed how *Morse* fits into the student-speech framework. Other circuits, however, have addressed this issue.

The Sixth Circuit has interpreted *Morse* as creating a new, additional framework for analyzing student speech. In *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324, 338–41 (6th Cir. 2010) (Rogers, J., concurring), a majority of the panel interpreted *Morse* as allowing courts not to apply *Tinker's* substantial-disruption test but instead to follow another "mode of analysis." The court in *Defoe ex rel. Defoe* treated schools' interest in "reducing racial tension" as comparable to the interest in *Morse* of preventing illegal-drug use. *Id.* at 340. Based on this conclusion, the court held that the school officials' decision to ban the Confederate flag, a "racially hostile" symbol, did not violate the First Amendment. *Id.* at 340–41.

We disagree with the Sixth Circuit's interpretation of *Morse* and believe that, based on the Court's clear emphasis in *Morse* on the danger of illegal-drug use, the better interpretation of that case is that it is simply another exception to *Tinker*, just as *Fraser* and *Kuhlmeier* are. *See, e.g., K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, ___ F.3d ___, 2013 WL 915059, at *5 (3d Cir. 2013) (including *Morse* as one of "several narrow categories of speech that a school may restrict even without the threat of substantial disruption" (internal quotation mark omitted)); *Morgan v. Swanson*, 659 F.3d 359, 387 (5th Cir. 2011) (en banc) (characterizing *Fraser*, *Kuhlmeier*, and *Morse* as "the exceptions to Tinker's general rule"); *Doninger v. Niehoff*, 642 F.3d 334, 344–45 (2d Cir. 2011) (including *Morse* with *Fraser* and *Kuhlmeier* in listing caveats to *Tinker*); *B.W.A. v. Farmington R-7 Sch. Dist.*, 554 F.3d 734, 741 (8th Cir. 2009) (calling *Morse* a "narrow holding" and applying *Tinker*). While the Supreme Court is free to create exceptions to or even abandon *Tinker's* substantial-disruption test, we must continue to adhere to the *Tinker* test in cases that do not fall within any exceptions that the Supreme Court has created until the Court directs otherwise.

816 F.2d 162, 164 (4th Cir. 1987). The seriousness of this issue rises from the tension between students' right to free speech and school officials' need to control the educational environment. As the Sixth Circuit has aptly stated:

> [O]n the one hand we are faced with the exercise of the fundamental constitutional right to freedom of speech, and on the other with the oft conflicting, but equally important, need to maintain decorum in our public schools so that the learning process may be carried out in an orderly manner.

*Melton v. Young*, 465 F.2d 1332, 1334 (6th Cir. 1972); *see also Barr v. Lafon*, 538 F.3d 554, 562 (6th Cir. 2008) (observing that a student-speech case raised "a most difficult question").

Despite having addressed student speech in other contexts, we have not yet addressed the wearing of Confederate flag apparel in schools under the Supreme Court's student-speech framework.[12] We have, however, had occasion to consider various interpretations of the Confederate flag, albeit in other contexts. Although we have recognized that for some people, the Confederate flag is "a symbolic acknowledgment of pride in Southern heritage and ideals of independence," *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 624 (4th Cir. 2002), we have also acknowledged that for other people, it "is a symbol of racial separation and oppression." *United States v. Blanding*, 250 F.3d 858, 861 (4th Cir. 2001); *see also Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 814 n.2 (4th Cir. 2004)

---

[12]District courts in this circuit have addressed this issue, including a case brought by another South Carolina student. *See Phillips v. Anderson Cnty. Sch. Dist. Five*, 987 F. Supp. 488 (D.S.C. 1997) (granting summary judgment to the school officials because they had a reasonable basis for determining that a Confederate flag jacket would cause a substantial disruption at school).

(en banc) (recognizing the "heated debate" in South Carolina over the flag on top of the State House dome); *Scott v. Sch. Bd. of Alachua Cnty.*, 324 F.3d 1246, 1248–49 (11th Cir. 2003) (noting that one expert planned to testify that the Confederate flag was "a historical symbol embodying the philosophical and political principals of a decentralized form of government" and another expert planned to testify that the flag "represented approval of white supremacy").

Other circuits have faced student-speech cases involving the Confederate flag that were similar to this case. In many of these cases, other circuits have upheld school officials' decisions to prohibit the Confederate flag at school because past racially charged incidents allowed the officials to predict that the Confederate flag would disrupt the schools. *See Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324 (6th Cir. 2010); *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214 (5th Cir. 2009); *B.W.A. v. Farmington R-7 Sch. Dist.*, 554 F.3d 734 (8th Cir. 2009); *Barr*, 538 F.3d 554; *Scott*, 324 F.3d 1246; *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358 (10th Cir. 2000); *Melton*, 465 F.2d 1332.

Of course, prohibiting students from having the Confederate flag at school is not automatically constitutional. For instance, in *Castorina ex rel. Rewt v. Madison County School Board*, 246 F.3d 536 (6th Cir. 2001), the Sixth Circuit reversed the district court's grant of summary judgment to the school officials. The court noted the lack of evidence suggesting that a ban on the Confederate flag was needed to prevent disruptions and emphasized that the Confederate flag appeared to have been specifically targeted by school officials, who let other potentially divisive racial symbols go unpunished. *Id.* at 540–44.

Notwithstanding the attention these cases may have received because of the subject matter of the students' speech, a close reading of these cases shows that they are simply student-speech cases, based on the fact that the courts under-

took the analysis set forth in *Tinker* and its progeny. *See, e.g.*, *Barr*, 538 F.3d at 564–69; *Castorina ex rel. Rewt*, 246 F.3d at 540–44; *West*, 206 F.3d at 1365–67. We agree that a student-speech case about the Confederate flag is merely a student-speech case and therefore, in a legal sense, no differ-ent than other student-speech cases that we have decided. *See, e.g.*, *Kowalski v. Berkeley Cnty. Sch.*, 652 F.3d 565 (4th Cir. 2011); *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003). Thus, despite the attention the Confederate flag may attract or the emotions that it may cause, this case is, at its core, a student-speech case governed by *Tinker* and other applicable Supreme Court precedent.[13] *Cf. United States v. Currence*, 446 F.3d 554, 558–59 (4th Cir. 2006) (observing that the parties' focus on whether the search of a bicycle's handlebars was analogous to the search of a car's interior as then-permitted by *New York v. Belton*, 453 U.S. 454 (1981), misconstrued the real issue, which was the more general rule of *Chimel v. California*, 395 U.S. 752 (1969)).

## C.

With this background in mind, we now turn to Candice's specific First Amendment claims.

### 1.

We begin with Candice's First Amendment claim based on

---

[13]In its analysis, the district court thoroughly surveyed student-speech cases involving the Confederate flag from various federal courts around the country. Based on its survey, the district court thoughtfully drew six "relevant principles for applying the *Tinker* standard to a school prohibi-tion on Confederate symbols." *Hardwick ex rel. Hardwick*, 674 F. Supp. 2d at 733. Our reading of these cases from other courts suggests that the principles for which they stand are not limited to student-speech cases involving the Confederate flag. Rather, they are interpretations of *Tinker* that, under the right factual scenario, would apply in any student-speech case.

her Confederate flag shirts. Before beginning our legal analysis, however, we first must determine which shirts are properly labeled as Confederate flag shirts and which are properly labeled as protest shirts.

Some shirts are easily classified as Confederate flag shirts. The "Southern Chicks," "Dixie Angels," "Southern Girls," "Black Confederates," Robert E. Lee, "Girls Rule," "Daddy's Little Redneck," and State House grounds shirts all clearly display the Confederate flag, and Candice does not dispute their characterization as Confederate flag shirts.

Candice disagrees, however, with the district court's classification of five other shirts as Confederate flag shirts: the "Jesus and the Confederate Battle Flag: Banned from Our Schools but Forever in Our Hearts," "Offended by School Censorship of Southern Heritage," "Honorary Member of the FBI: Federal Bigot Institutions," "Our School Supports Freedom of Speech for All (Except Southerners)," and "Public Schools Should Educate Not Discriminate Against Southern Heritage" shirts. We disagree with Candice, and we consider these shirts to be Confederate flag shirts. First, the "Jesus and the Confederate Battle Flag: Banned from Our Schools but Forever in Our Hearts" shirt includes a censored Confederate flag (that is, a Confederate flag with a red circle around it with a red diagonal line across the diameter of the circle), as well as the first Confederate national flag, the third Confederate national flag, and the Bonnie Blue flag, which are three other recognizable Confederate symbols. This shirt is therefore a Confederate flag shirt. As for the other four shirts, their lettering reveals a Confederate flag. The red, white, and blue coloring, in a diagonal cross, unmistakably represents the Confederate flag. These shirts are also thus properly considered Confederate flag shirts.

The record contains ample evidence from which the school officials could reasonably forecast that all of these Confederate flag shirts "would materially and substantially disrupt the

work and discipline of the school." *Tinker*, 393 U.S. at 513. Latta is a small Southern town in which whites and African-Americans were segregated, including in school, for more than a century. When the schools were finally integrated in the 1970-71 school year, the presence of racial tension was understandable. Over the past four decades, this tension has diminished, but it has not completely disappeared, as numerous incidents illustrate.

For example, the Confederate flag itself has caused problems in Latta schools on multiple occasions, including the prom incident from the mid-1980s, the truck in the parking lot in the early 1990s, the debate over the flag on the State House dome in 2000, the classroom disruption that Heyward described, and the belt buckle in 2009.[14]

Racial tension in Latta was not limited to incidents involving the Confederate flag. A nonflag-related example of such tension was the burning of an African-American church by two high school students. *Cf. West*, 206 F.3d at 1362 (considering off-campus occurrences when evaluating whether school officials could reasonably predict that the Confederate flag would cause a substantial disruption at school).

These incidents, some involving the Confederate flag and some not, demonstrate that continued racial tension exists in Latta schools. Taken together, they tell a story of a community and its schools that, although making progress in race relations, are not immune from incidents of racial conflict.

_____

[14]Because the belt-buckle incident took place after her dispute with school officials about Confederate flag shirts, Candice contends that we cannot consider this incident when evaluating the school officials' decision to ban the Confederate flag shirts and protest shirts.

We disagree. Although we do not rely solely on this incident to uphold the school officials' decision, we cannot turn a blind eye to the fact that the incident occurred because it provides strong support for the reasonableness of the school officials' determination that the Confederate flag was likely to cause a substantial disruption at school.

Although the incidents caused by the Confederate flag are enough on their own to justify the decision of the school officials to prohibit the Confederate flag shirts, when combined with other racially charged incidents, they provide overwhelming support for the conclusion that the Confederate flag shirts "would materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 513; *see also Defoe*, 625 F.3d at 335 ("*Tinker* does not require that displays of the Confederate flag *in fact* cause substantial disruption or interference, but rather that school officials reasonably *forecasted* that such displays could cause substantial disruption or materially interfere with the learning environment." (citing *Tinker*, 393 U.S. at 514)); *A.M. ex rel. McAllum*, 585 F.3d at 224 (observing that cases such as *Melton* and *Phillips v. Anderson County School District Five,* 987 F. Supp. 488 (D.S.C. 1997), "do not stand for the proposition that schools may not prohibit the display of the Confederate flag unless it has actually caused past disruptions" but instead "reflect the principle that administrators will usually meet their burden under *Tinker* by showing that the proscribed speech has in fact been disruptive in the past").

In arguing that her shirts were not likely to cause a disruption, Candice points to the disciplinary records at the middle school and the high school, which she claims contain only a few incidents of racial disputes or fights. *See* J.A. 559–687. Notably, these records do contain racially charged incidents, indicating that at least some racial tension still exists. *See, e.g.*, J.A. 564 (noting that a student was punished for an altercation that started after one student was called a "cracker"); J.A. 565 (noting that a student was punished for calling African-American students "n------").

But putting aside these examples, the disciplinary records represent only a short period of time, from 2004 to 2007. The school officials pointed to multiple incidents of racial tension over the past few decades. That some of these incidents may be almost thirty years old does not mean that the school offi-

cials could not consider them in conjunction with more recent incidents. In considering the history of a town that has experienced slavery and segregation, incidents from even thirty years ago are not so far removed from the present as to be irrelevant to determining the atmosphere of Latta schools. For the school officials to consider the full picture when determining what might cause a disruption at school, they can consider the causes of the types of incidents that they are trying to prevent from recurring. Therefore, that recent racially charged incidents are fewer in number or severity than such incidents from the more distant past does not prevent the school officials from considering older incidents when determining whether, based on the current school environment, a substantial disruption is likely to occur.

Related to her reliance on the alleged lack of racially charged incidents in the schools' disciplinary records, Candice contends that her shirts never caused any disruption and were merely a "silent, peaceable display" of the Confederate flag that even drew positive remarks from some students. Appellant's Br. at 29. Even assuming that Candice's shirts never caused a disruption, her argument misses the mark. That her shirts never caused a disruption is not the issue; rather, the issue is whether school officials could reasonably forecast a disruption because of her shirts. *See Tinker*, 393 U.S. at 513–14. As we have noted, "a public school has the power to act to prevent problems before they occur, and the school is not limited to prohibiting and punishing conduct only after it has caused a disturbance." *Newsom ex rel. Newsom*, 354 F.3d at 259 n.7. We have already concluded that the school officials met their burden of showing that they could predict that a substantial disruption might occur.

Similarly, Candice's intent that her Confederate flag shirts be only a symbol of her heritage and religious faith is irrelevant. Again, the proper focus is whether school officials could predict that the Confederate flag shirts would cause a disruption. *See Tinker*, 393 U.S. at 513–14; *see also B.W.A. v. Far-*

*mington R-7 Sch. Dist.*, 508 F. Supp. 2d 740, 749 (E.D. Mo. 2007) ("[T]he plaintiff's interpretation of the Confederate flag's meaning is largely irrelevant because courts recognize that it is racially divisive in nature." (citing *Briggs v. Mississippi*, 331 F.3d 499, 506 (5th Cir. 2003)).

Because school officials are far more intimately involved with running schools than federal courts are, "[i]t is axiomatic that federal courts should not lightly interfere with the day-to-day operation of schools." *Augustus v. Sch. Bd. of Escambia Cnty., Fla.*, 507 F.2d 152, 155 (5th Cir. 1975); *see also Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint."). As long as school officials reasonably forecast a substantial disruption, they may act to prevent that disruption without violating a student's constitutional rights, and we will not second guess their reasonable decisions. *See Tinker*, 393 U.S. at 513–14. Here, multiple incidents of racial tension in Latta schools and the potential for such vastly different views among students about the meaning of the Confederate flag provide a sufficient basis to justify the school officials' conclusion that the Confederate flag shirts would cause a substantial disruption. Therefore, Candice's First Amendment right was not violated by the school officials when they refused to allow her to wear the Confederate flag shirts at school.

2.

We now turn to Candice's First Amendment claim based on the protest shirt. Like the Confederate flag shirts, we conclude that the school officials reasonably predicted that the protest shirt was likely to cause a substantial disruption.

Based on our determination that many of Candice's so-called protest shirts were in fact Confederate flag shirts, only one shirt can properly be classified as a protest shirt: the shirt

displaying the American flag with "Old Glory" above the flag and "Flew over legalized slavery for 90 years!" underneath it.

Whether the shirt makes a true statement is not a factor in our analysis. As long as a student's speech is likely to cause a substantial disruption, school officials can prohibit or punish the speech. *See id.*

The protest shirt was undoubtedly likely to cause such a disruption. It explicitly broadcast the fact that African-Americans were slaves for part of American history, just as the Confederate flag does for some people when they see it. The same students who would be upset by the Confederate flag shirts would likely be equally upset by this protest shirt. Thus, any disruptions that the Confederate flag shirts might cause could just as easily be caused by Candice's protest shirt. The school officials are therefore justified in relying on the same past incidents of racial tension that allowed them to prohibit the Confederate flag shirts to prohibit this protest shirt. Accordingly, Candice's First Amendment right was not violated when the school officials did not allow her to wear the protest shirt.

## IV.

We next address Candice's Fourteenth Amendment claims that the schools' dress codes are unconstitutionally overbroad and vague, violating her right to due process, and that they are not viewpoint neutral, violating her right to equal protection.

## A.

We begin with Candice's facial challenge to the dress codes on the basis that they violate due process because they are unconstitutionally overbroad and vague.

## 1.

First, we consider Candice's claim that the dress codes are unconstitutionally overbroad. Although the Supreme Court

has counseled that "[f]acial challenges are disfavored," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008), one such challenge that is permitted is an overbreadth challenge. This doctrine allows a person to whom a law could be constitutionally applied to challenge the constitutionality of the law because the "statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *see also New York v. Ferber*, 458 U.S. 747, 767–69 (1982).

Under the overbreadth doctrine, "a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications." *Ferber*, 458 U.S. at 771. To prevail on an overbreadth claim, a plaintiff "must demonstrate that a regulation's overbreadth is 'not only . . . real, but substantial as well, judged in relation to the [challenged regulation's] plainly legitimate sweep,' and also that no 'limiting construction' or 'partial invalidation' could 'remove the seeming threat or deterrence to constitutionally protected expression.'" *Newsom ex rel. Newsom*, 354 F.3d at 258 (quoting *Broadrick*, 413 U.S. at 613, 615) (alterations in original).

The public-school context of this overbreadth challenge raises additional considerations. First, "[b]ecause of the duties and responsibilities of the public elementary and secondary schools, the overbreadth doctrine warrants a more hesitant application in [the public school] setting than in other contexts." *Id.* (quoting *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 259 (3d Cir. 2002)) (alterations in original). Second, "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Fraser*, 478 U.S. at 686.

Under these legal standards, the dress codes are not overbroad. The middle school dress code prohibits clothes that

would "cause disruption" or "be offensive," thereby incorporating the standards of both *Tinker* and *Fraser*. J.A. 38, 39. The high school dress code bans "[s]hirts with obscene/derogatory sayings," which tracks *Fraser*. J.A. 45. Because the dress codes are guided by *Tinker* and *Fraser*, "there is no real danger that [they] compromise[ ] the First Amendment rights of other . . . students," *B.W.A.*, 508 F. Supp. 2d at 750–51, while at the same time giving school officials the needed "degree of flexibility in school disciplinary procedures," *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985).

Reinforcing our conclusion that the dress codes are not overbroad is the collection of photographs of other clothing that Liebenrood has found to have violated the high school's dress code. *See* J.A. 295–375. This clothing includes shirts that are sexually suggestive, promote alcohol use, and promote violence, all of which school officials could constitutionally prohibit under *Tinker* or *Fraser*. These examples of prohibited clothing indicate that the school officials construe the dress codes in a way that does not violate students' rights. *See West*, 206 F.3d at 1368 (considering how school officials construed the school policy in determining whether the policy was overbroad). Therefore, the dress codes are not overbroad, and Candice's due process right was not violated.

2.

We next examine whether the dress codes are unconstitutionally vague and thus violate due process. A law is unconstitutionally vague if "it fails to establish standards for the [government] and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). A law will fail to establish these standards if "ordinary people can[not] understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Just as the overbreadth doctrine is designed to prevent self-censorship because of fear of a law's enforcement, the vagueness doctrine similarly ensures that a law does

not "deter constitutionally protected and socially desirable conduct." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 36 (1963). Furthermore, the doctrine also protects against "arbitrary and discriminatory enforcement" of the law. *Morales*, 527 U.S. at 56.

Despite the concerns about vague laws, school officials have greater leeway when crafting school policy than legislatures do in adopting criminal statutes because of the need of school officials to respond to "a wide range of unanticipated conduct disruptive of the educational process." *Fraser*, 478 U.S. at 686; *see also Sypniewski*, 307 F.3d at 260 ("[T]he demands of public secondary and elementary school discipline are such that it is inappropriate to expect the same level of precision in drafting school disciplinary policies as is expected of legislative bodies crafting criminal restrictions.").

Here, nothing about the dress codes is so vague that Candice was unable to conform her speech to the required standards. Again, the dress codes are guided by *Tinker* and *Fraser*, and they are as specific as the dress code in *Fraser* that the Supreme Court upheld when the student challenged that dress code on due process grounds. *See Fraser*, 478 U.S. at 678. Furthermore, the school officials explicitly informed Candice on multiple occasions that Confederate flag shirts were not permitted under the dress codes. The dress codes were therefore interpreted by the school officials for Candice in the specific context of her shirts. Nothing in the record plausibly supports any claim that she was unaware of this prohibition on Confederate flag apparel. *See A.M. ex rel. McAllum*, 585 F.3d at 225 (holding that students' due process rights were not violated when the students "were given a warning that the particular speech at issue would give rise to discipline"). Thus, the dress codes, both as written and as applied to Confederate flag clothing, are not unconstitutionally vague, and Candice's right to due process was not violated.

B.

Finally, we address Candice's claim that her right to equal protection was violated because the dress codes are not view-point neutral.

The Equal Protection Clause of the Fourteenth Amendment provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). When an alleged equal protection violation is based on a First Amendment claim, we "fuse[ ] the First Amendment into the Equal Protection Clause." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 384–85 n.4 (1992); *see also Barr*, 538 F.3d at 575–76.

The Supreme Court has not expressly discussed the relationship between viewpoint discrimination and student speech, but several cases are relevant on this issue. First, in *Tinker*, the Court called "relevant" the fact that school officials targeted speech about the Vietnam War but "did not purport to prohibit the wearing of all symbols of political or controversial significance." *Tinker*, 393 U.S. at 510. Despite this fact, the Court in *Tinker* based its holding on the fact that the school officials could not predict that a substantial disruption was likely to occur. *See id.* at 514. Such a prediction would be a "constitutionally valid reason[ ] to regulate [the students'] speech." *Id.* at 511. Without such a reason for school officials to regulate speech, however, "students are entitled to freedom of expression of their views." *Id. Tinker* therefore stands for the proposition that school officials may not target a specific viewpoint unless they can predict that that speech would be likely to cause a substantial disruption. *Id.* ("[T]he prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material

and substantial interference with schoolwork or discipline, is not constitutionally permissible.").

Over two decades after *Tinker*, the Court decided *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995). In that case about the funding for an independent student newspaper with a religious perspective at a university, the Court wrote, "In the realm of private speech or expression, government regulation may not favor one speaker over another." *Id.* at 828. Such viewpoint discrimination is "an egregious form of content discrimination," and "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* at 829.

Other circuits are split on the extent to which *Rosenberger* alters the analysis of *Tinker*. Elementary and secondary schools are undoubtedly different than colleges, universities, and public discourse generally, and this distinction results in different legal standards in some instances. *See Hosty v. Carter*, 412 F.3d 731, 740–41 (7th Cir. 2005) (en banc) (Evans, J., dissenting); *see also Sypniewski*, 307 F.3d at 267 ("[T]the public school setting is fundamentally different from other contexts, including the university setting. Primary and secondary school officials stand in a unique relationship with respect to their students, most of whom are minors." (internal footnote omitted)). On one side of this issue, the Sixth Circuit has held "that schools' regulation of student speech must be consistent with both the *Tinker* standard and *Rosenberger*'s prohibition on viewpoint discrimination." *Barr*, 538 F.3d at 571. On the other side, the Fifth Circuit has held, "No matter how 'axiomatic' the generalized rule against viewpoint discrimination may be, we cannot neglect that this case arises in the public schools, a special First Amendment context, which admits of no categorical prohibition on viewpoint discrimination." *Morgan v. Swanson*, 659 F.3d 359, 379 (5th Cir. 2011) (en banc) (internal footnotes omitted). The Eighth and Ninth Circuits have agreed with the Fifth Circuit's position. *See*

*B.W.A*, 554 F.3d at 740; *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1184–85 (9th Cir. 2006) *cert. granted, judgment vacated sub nom. Harper ex rel. Harper v. Poway Unified Sch. Dist.*, 549 U.S. 1262 (2007).

We need not decide in this case the relationship between *Tinker* and *Rosenberger*. Assuming that a school dress code must be viewpoint neutral on its face and in its enforcement, the record here indicates that these requirements are met. First, both dress codes are viewpoint neutral. The middle school policy prohibits clothing that would "distract others, interfere with the instructional programs, or otherwise cause disruption. . . . [or] that displays profane language, drugs, tobacco, or alcohol advertisements, sexual innuendoes or anything else deemed to be offensive," while the high school policy forbids "[s]hirts with obscene/derogatory sayings," J.A. 39, 45. Neither policy targets the Confederate flag or any other specific viewpoint, so each policy is viewpoint neutral.

Second, both dress codes are enforced in a viewpoint-neutral manner. The record contains pictures of many shirts that Liebenrood required students to remove because they violated the dress code, including two Malcolm X shirts, *see* J.A. 348, 374, thereby undermining Candice's claim that the school officials "did not evenhandedly ban all race sensitive symbols," Appellant's Br. at 47. The school officials indicated that all racial symbols are banned under the dress codes. *See* J.A. 133, 523.

Candice's contention that school officials did not punish students for wearing other racially themed shirts is insufficient to defeat summary judgment. *See* J.A. 28, 155. At most, the evidence on which she relies proves that "various students 'got away'" with wearing clothes that violated the dress codes. *Defoe ex rel. Defoe*, 625 F.3d at 337. By her own admission, Candice "got away" with wearing at least one Confederate flag shirt when she wore the South Carolina State House grounds shirt "for several days" without being required

to change shirts because the shirt had not been "brought to [Liebenrood's] attention." J.A. 24–25. That some students—including Candice—avoided detection when wearing clothes that violated the dress codes is not evidence that the dress codes were enforced in a viewpoint-discriminatory manner; rather, it is, without more, simply evidence that the dress codes were not always enforced stringently. Given that Candice's Confederate flag shirt and other racially themed shirts all escaped notice, this lack of enforcement was not based on any viewpoint discrimination, and Candice's position that the dress codes were enforced in a viewpoint-discriminatory manner is mere speculation. *See Othentec Ltd. v. Phelan*, 526 F.3d 135, 142 (4th Cir. 2008) (observing that a plaintiff's "allegations, speculation, and inference are not enough to survive summary judgment"). Candice's right to equal protection was therefore not violated by the dress codes or their enforcement.

V.

Although students' expression of their views and opinions is an important part of the educational process and receives some First Amendment protection, the right of students to speak in school is limited by the need for school officials to ensure order, protect the rights of other students, and promote the school's educational mission. When, as here, student speech threatens to disrupt school, school officials may prohibit or punish that speech. The Latta school officials therefore did not violate Candice's First Amendment right when they refused to allow her to wear Confederate flag shirts and protest shirts at school, and the dress codes and their enforcement did not infringe on Candice's Fourteenth Amendment rights. Thus, the judgment of the district court is affirmed.

*AFFIRMED*